IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

TYRONE WELCH                                                     PLAINTIFF

              v.                        Civil No.   12-5137

OFFICER MORGAN, Washington
County Detention Center; and
MAJOR RANDALL DENZER                                            DEFENDANTS


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights case filed pursuant to 42 U.S.C. § 1983.  Plaintiff, Tyrone Welch,

proceeds *pro se* and *in forma pauperis.*

At the time he filed this lawsuit, Welch was incarcerated in the Washington County

Detention Center (WCDC).  Welch contends that on June 5, 2012, Officer Chad Morgan used

excessive force against him.  Welch names as Defendants Morgan and the jail administrator,

Major Randall Denzer.

Pending before me for report and recommendation is the Defendants' motion for

summary judgment (Docs. 23-25).  Defendants have also demanded a trial by jury.  Plaintiff was

allowed to present his response to the summary judgment motion in an evidentiary hearing held

on February 26, 2013.  Defendants submitted a video of the incident containing two segments:

the first in the pod; and the second in the hallway.  Defendants' Ex. 1-D.  At the conclusion of

the hearing, the Defendants were asked to produce incident reports documenting the use of force

by Defendant Morgan and any associated grievances.  These documents have been received and

-1-

marked <u>Court's Exhibit 2.</u>   A transcript of the proceeding was also ordered and has been received.

### 1.  Background and Evidence Presented

Welch maintains that Officer Morgan used excessive force against him on June 5, 2012. As jail administrator, Welch contends Randall Denzer is responsible for Morgan's conduct and participated in the cover up that followed the incident.

At the February 26th hearing, the following witnesses testified: (1) Michael T. Nimmo; (2) Douglas D. Ellis; (3) Nathan A. Conner; (4) Chad Morgan, a Defendant; (5) Tyrone A. Welch, the Plaintiff; (6) Rhonda J. Meschede; (7) Carlos Pineda;[1] and (8) Brian Roy.  For discussion purposes, the testimony of these witnesses will be summarized.

### Tyrone Welch

Welch was detained at the WCDC from May 31, 2012, to November 1, 2012.  <u>Transcript at pgs. 87-88.</u>  Welch testified that as of the June 5th incident he had not been convicted of any charges.  <u>Id. at pg. 88.</u>

Welch testified that on the date in question, June 5, 2012, he was breaking out with a rash that was itching, burning, and his arm was bleeding.  <u>Tr. at pgs. 88-89.</u>  He pushed the emergency intercom button numerous times to let the jail staff  know he seriously needed medical assistance.  <u>Id. at pg. 110.</u>  Welch testified that he had been dealing with the rash for a couple of days and had put in a medical request with no response.  <u>Id. at pg. 89.</u>

Morgan came to the pod to ask what  the problem was.  <u>Tr. at pg. 89.</u>  Welch testified he was moving his arm and raising his sleeve so that Morgan could see the rash, which was all over

---

[1]No substantive testimony was elicited from Pineda.

Welch's body.  Id.  Welch testified he was trying to get Morgan to take him to see the nurse.  Id.
Morgan responded that Welch would have to complete a medical request.  Id.  According to
Welch, Morgan was telling jokes and having fun with both inmates and Deputy Conner.  Id. at
pg. 93.  Welch pressed the intercom button again while he was talking to Morgan to let him
know the situation was serious.  Id.

Welch testified he was sick, in pain, and angry.  Tr. at pg. 90.  About this time, Michael
Nimmo told Welch to get out and walked up and pushed him.  Id.  Welch testified that when he
asked Morgan if he saw what Nimmo had done, Morgan responded by telling Welch to come out
into the hallway and he was going to take Welch to the nurse.  Id.  Nimmo was also taken to the
hallway.  Id.

Welch testified that when he raised his right arm to show Morgan his rash, pulled the
sleeve up, and said "look," that Morgan just "grabbed [him] and just started throwing [him]
around."  Tr. at pg. 90.  Welch asserted that he had not been told to put his hands behind his
back.  Id. at pg. 92.

According to Welch, he showed Morgan his arm for a second time to make sure that
Morgan was taking him seriously.  Tr. at pg. 93.  Welch testified that Morgan had no reason to
feel as if Welch was attempting to strike him or Nimmo.  Id. at pgs. 95-96.  Welch asserted that
his arm was in the wrong position to be swinging at Morgan.  Id. at pg. 105.  Had his arm not
been held with his elbow going straight out from his shoulder socket and his fist behind his ear,
Welch testified that he could see how his movement might have been perceived as aggressive.
Id. at pgs. 105-106.

Welch testified that as a result of the use of force, he suffered injuries to his neck and
back.  Tr. at pg. 97.  Specifically, he testified that his neck was swollen and tender.  Id.

AO72A
(Rev. 8/82)

Additionally, Welch testified that he still has sharp pains in his back "every now and then." Id. His neck, however, is "all right." Id. Finally, Welch testified that he had to serve eight days in the "hole" as a result of being charged with disciplinary violations. Deft's Ex. 1-C.

Welch's WCDC medical records indicate he sought medical treatment for a rash on June 5th. Court's Exhibit 1 at pg. 8. On June 6th, he sought medical treatment for a real sharp pain in his neck as a result of the "brutal beatin[g]" he received on the 5th. Id. at pg. 7. He submitted three medical requests on the 7th; two dealt with his neck, throat, or back, and the third dealt with his rash. Id. at pgs. 9-11.

He was seen by the doctor on June 12th and his rash was noted to be better; he was prescribed Ibuprofen, 600 mg., three times a day for thirty days as needed for back pain. Court's Exhibit 1 at pg. 6.

Welch submitted a number of grievances stemming from the June 5th incident. Plaintiff's Ex. 6. These grievances are dated: June 7th; 9th; 12th; 18th; 19th; 24th; 27th; July 24th; and August 8th. Id.

Welch also submitted an exhibit showing his disciplinary sanctions were reviewed and the lock-down for eight days for verbal confrontation with a deputy and failure to obey a lawful request was upheld. Plff's Ex. 5. Further, the exhibit also indicates that Sergeant M. Freeman investigated the allegations of excessive force made against Morgan. Id. Freeman found the allegations unfounded. Id.

**Michael T. Nimmo**

Nimmo testified that he was incarcerated in the WCDC in May and June of 2012. Tr. at pg. 14. He vaguely recalls the events of June 15th and states he was probably in the mix of inmates "mouthing off" at one of the officers. Id. at pg. 15.

-4-

He testified that he has no independent recollection of what occurred in the hallway but after watching the video he knew both he and Welch were directed to step out into the hallway. Tr. at pg. 15.  The video establishes that Nimmo saw Welch taken down.  Id.  However, Nimmo testified that he had no independent recollection of this occurrence.  Id. at pgs. 17-18.

**Douglas Ellis**

Ellis is currently incarcerated in the Arkansas Department of Correction (ADC), Tucker Unit.  Tr. at 20.  In June of 2012, he was incarcerated in the WCDC.  Id.

Ellis testified that on June 5th, Welch was repeatedly pushing the intercom button and telling jail staff that he had a medical emergency.  Tr. at pgs. 27-28.  Welch was asking to see someone about the rash on his arm.  Id.  Ellis testified that Welch raised his voice above normal but not in a threatening tone.  Id. at pg. 29.  According to Ellis, the intercom is to be used only in a case of a dire emergency.  Id. at pgs. 27-28.

Ellis was sitting at a table when the commotion started.  Tr. at pg. 26.  He recalled that Welch was constantly moving his arms.  Id. at pg. 23.

Once Morgan got to the pod, Ellis witnessed Nimmo push Welch in front of Morgan and saying that Welch needed to be moved out of the pod because he was causing trouble.  Tr. at pg. 22.  Both Nimmo and Welch were taken out to the hallway.  Id. at pg. 28.  The pod door was quickly closed preventing Ellis from observing what occurred in the hallway.  Id. at pgs. 23-24, 27.

Ellis could not hear what they were saying in the hallway but did hear "a rumbling noise in the hallway, like somebody had been slammed to the floor or something like that."  Tr. at pg. 27.  A short time later, Nimmo came back into the pod and said Welch had been slammed to the floor.  Id. at pg. 28.

-5-

**Deputy Nathan Conner**

Conner is now, and was in June of 2012, an adult detention officer.  Tr. at pg. 32.   On June 5th, Morgan was asked to go to N block and talk to Welch because he had been pushing the emergency intercom button.  Id.  When Conner went to N block, Morgan was already talking to Welch.  Tr. at pg. 33.

Welch was demanding to be seen by the nurse about the rash on his arm.  Id. at pgs. 33-34.  Morgan was telling Welch to remain calm and fill out a request form.  Id. at pg. 52.  At the time, no nurse was on duty but Welch was told she would come and see him as soon as she came on duty.  Id. at pg. 34.  Welch was informed that if he continued to push the emergency button when there was no emergency, he would be placed on lock down.  Id. at pg. 52.

Conner testified that Nimmo stepped up and told Welch he needed to get out because he did nothing but cause problems.  Tr. at pg. 34.  Nimmo then attempted to push Welch.  Id.  Morgan instructed Welch to step out in the hallway and Conner told Nimmo to do the same.  Id; see also Plff's Ex. 4.

Once they were in the hallway, Morgan instructed Welch to shut up and stand against the wall with his hands behind his back.  Tr. at pgs. 34 & 41.  Welch was not cussing or yelling at Morgan but he was yelling at Nimmo.  Id. at pg. 41.  Welch did not comply with Morgan's order and raised one arm above his shoulder.  Id. at pgs. 42-43.  Conner testified that as he and Nimmo were walking behind Morgan in the hallway that Morgan grabbed Welch by his shoulders and threw him into Conner.  Id. at pg. 42.  Morgan then put Welch on the floor and handcuffed him.  Id.

-6-

Conner testified that Welch did not raise his arm up in an aggressive manner towards Morgan and did not resist in anyway.  Tr. at pgs. 42& 47.  However, Conner would have viewed Welch's raising of his arm as a sign of aggression.  Id. at pg. 58.

The WCDC procedure with regard to the use of force has levels of control for a non-compliant or uncooperative detainee: verbal persuasion; verbal warnings; show of force; retreat; soft empty hand control; hard empty hand control; pepper foam; and lethal force.  Plff's Ex. 2; Deft's Ex. 1-B.  The WCDC also has a policy on the use of force which provides:

> Only that amount of physical force necessary to maintain or regain control of a detainee shall be used by the staff of the Washington County Detention Facility. Physical force may be used only when an attack by a detainee(s) on a facility employee(s), visitor(s), or other detainee(s) is actually occurring, is clearly imminent, or when other lesser means have failed to achieve a legitimate and necessary objective.  Physical punishment of a detainee shall not be permitted under any circumstances.

Plff's Ex. 3; Deft's Ex. 1-B.

The levels of control were to be followed in sequence whenever possible.  Plff's Ex. 2; Deft's Ex. 1-B.  In Conner's opinion, although Morgan did not necessarily follow each step in order, his actions complied with the procedure.  Tr. at pg. 51.

Conner testified that when other inmates are around you need to act quickly.  Tr. at pg. 45.  Further, he testified that he would have taken Welch to the floor.  Id. at pgs. 47-48.  Conner testified that just having a detainee against the wall does not protect you from being head butted or kicked.  Id. at pg. 49.

**Deputy Chad Morgan**

Morgan is an adult detention center officer and occupied that position in June of 2012. Tr. at pg. 60.  Morgan testified that on the day in question, Welch and Nimmo were taken out

-7-

into the hall because they were getting "riled up."  Id. at pg. 65.  The intent was to talk to them

and determine what the problem was.  Id. at pg. 66.

Morgan testified that anytime an inmate is pulled out into the hall he routinely directs the

inmate to stand with their hands behind their back.  Id. at pg. 62.  This keeps the inmate from

moving their hands and arms around.  Id. at pg. 79.   Because it is a routine act, Morgan

indicated he did not always put it in his reports.  Id. at pg. 62.

Pod control releases and closes the pod door.  Tr. at pgs. 76-77.  Depending on what the

pod control officers are doing at the time, it could take anywhere from a few seconds to a minute

for the pod door to be secured.  Id. at pg. 76.  Additionally, there is a slight delay because so

many cameras are going through one set up.  Id. at pg. 77.  Morgan testified that until the door

is secured, other inmates can gain access to the hallway.  Id. at pg. 76.

Morgan testified that Welch was raising his voice and cursing.  Tr. at pgs. 63-65.

Morgan believed the cursing was directed towards Nimmo; however, Morgan testified that when

Welch raised his arm up, Morgan took it as a threat.  Id. at pg. 65-66.  Morgan believed Welch

was either going to take a swing at him or Nimmo.  Id. at pg. 69; see also Plff's Ex. 4.

Morgan testified he then used force to move Welch, get him off balance, and take him

to the floor.  Id. at pg. 66.  Morgan testified he had originally intended to just take Welch to the

wall but Welch ran into Conner when Morgan was attempting to turn him.  Id. at pg. 67.  As a

result, only Welch's left side was against the wall and Morgan did not believe this was a secure

position.  Id. at pg. 70.  Morgan testified he could not gain full control of Welch's arms because

of the position Welch ended up in.  Id. at pg. 70.  The entire incident did not last more than five

AO72A
(Rev. 8/82)

to seven seconds.  Id. at pg. 68.  Morgan testified his decision on the amount of force to use was based on a split second decision.  Id.

Morgan testified that which steps of the use of force procedures that were used was entirely dependent on the situation.  Tr. at pg. 74.  When Welch raised his arm, Morgan indicated there was not sufficient time to utilize the first levels of force contained in the policy.  Id.  Morgan submitted as an exhibit the disciplinary report issued as a result of Welch's conduct.  Deft's Ex. 1-C.

Morgan initially testified he had never been disciplined or sued over the use of excessive force.  Tr. at pg. 82.  However, after it was drawn to his attention by the Court, he testified that he had been named as a Defendant in a lawsuit filed in this Court on March 26, 2012, Adams v. Morgan, et al., Civil No. 12-5054.  Other than this case and the Adams case, Morgan indicated that he was unaware of any other allegations that he used excessive force.  Id. at pg. 101.  Generally, if an inmate submits a grievance alleging the use of excessive force, the matter is investigated and the officer counseled about it.  Id.

As noted above, Defendants were directed to submit any use of force reports and any associated grievances.  The Court was supplied with in excess of one-hundred reports of varying lengths.  Court's Ex. 2.  The reports are dated 2006 to 2013.  Id.  They appear to cover every use of force report in which Morgan was involved in anyway with a use of physical force.  Id.; see e.g. report dated February 26, 2013, in which Morgan ran the camera.  Id.

Of the reports, only four have grievances associated with them.  Court's Ex. 2.  These four are: (1) a March 16, 2006, report in which a detainee, Nathan Matthews, alleges he was assaulted by Morgan and others; (2) a January 5, 2010, report in which Morgan is alleged to have

-9-

twisted a detainee's arm behind his back and thrown him on the floor; (3) a report dated June 15, 2010, in which Morgan took a detainee, Jeff Yeakley, to the ground; and (4) the use of force at issue in this case, June 5, 2012.  Id.  Curiously, no report has been submitted about the use of force at issue in the Adams case which is alleged to have occurred on January 11, 2012.

### Rhonda Meschede

Meschede testified that she is employed at the WCDC as a nurse and was so employed in June of 2012.  Tr. at pg. 115.  Meschede testified that she saw Welch on June 6th for complaints that his neck was swollen.  Id.  He reported being "roughed up" the day before.  Id.  She noticed some slight swelling on the right side of his neck and some discoloration and redness there.  Id.  She also noticed a rash on his arms and his legs; however, Welch's primary complaint was itching.  Id. at pg. 116.  Because his throat was swollen, Meschede ordered a soft diet for him.  Plff's Ex. 5.

In nurse's notes dated June 6th, Meschede indicated she had seen Welch on June 5th and he did not voice any complaints about his neck.  Plff's Ex. 5.  The notes indicate his primary complaint on June 5th was about a rash on his arms and legs.  Id.

### Brian Roy

Roy testified he is a corporal at the WCDC.  Tr. at pg. 121.  He occupied the same position in June of 2012.  Id.

Roy reviewed the videotape of the hallway scene.  Tr. at pg. 122.  He then testified that Morgan had responded appropriately to Welch's action of raising his arms above his head.  Id.  Roy noted that there was another inmate walking around at the time and testified that he would have "probably done the same thing."  Id.

-10-

Roy testified he came up to the hallway to provide assistance.  Tr. at pg. 124.  When Welch asked him to check the camera, Roy responded: "You're on camera."  Id.

Roy testified he did point a stun gun at Welch because he was being belligerent and the taser was used for compliance.  Tr. at pgs. 124 & 131.  Roy testified that the stun gun was not on at the time.  Id. at pgs. 125-126.  Roy acknowledged that it would not be appropriate to use the stun gun on a handcuffed inmate; and there was no reason for him to point the stun gun at Welch as he had already been handcuffed.  Id. at pg. 131.

**2.  Applicable Standard**

In this case, as noted above, there is a pending motion for summary judgment. Additionally, Defendants have demanded a trial by jury.  A pretrial evidentiary hearing may be utilized to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Johnson v. Bi–State Justice Center, 12 F.3d 133, 135 (8th Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  When both sides present evidence, the procedure "resembles a summary judgment motion with live evidence."  Id.  The Court must avoid credibility determinations, believe the Plaintiff's evidence, and draw all justifiable inferences in the Plaintiff's favor.  Id. at 136.

**3.  Discussion**

Welch testified that he was a pretrial detainee at the time of the incident at issue in this case.  In Johnson-El v. Schoemehl, 878 F.2d 1043 (8th Cir. 1989) the Eighth Circuit discussed the standard applicable to pretrial detainees and stated:

-11-

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

Id., at 1048.

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. Andrews v. Neer, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."); see also Hicks v. Norwood, 640 F.3d 839 (2011)(applying Fourteenth Amendment's objective reasonableness standard to claims brought by a pretrial detainee). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. Schoemehl, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. See e.g., Wilson v. Williams, 83 F.3d 870, 875 (7th Cir. 1996).

Applying these principles, I believe there is a question of fact as to whether the application of force was objectively unreasonable. In this case, the incident between Welch and Morgan was videotaped and the DVD produced was introduced as evidence. In the first

-12-

segment, Morgan is at the door of the pod  talking to Welch.  Morgan uses no physical force against Welch in this segment.  When both Welch and Nimmo are called out into the hallway, the second segment of the video begins.  In this segment, Welch is seen using his left hand to pull up his right shirt sleeve.  He then raises his right arm so that his hand is behind his head.  Morgan grabs the front of Welch's shirt and propels him across the hallway into the opposite wall, down to the floor, and back again to the original wall.

Morgan maintains that when Welch raised his arms he viewed it as an aggressive act and that his safety, as well as that of Nimmo and Conner, was in jeopardy.  In Morgan's view, the video shows the dangerous situation that existed stemming partly from the fact that the pod door had not yet been closed.  Contrary to Morgan's contention, the video does not blatantly contradict Welch's version of the events.  Instead, the video could be considered supportive of both parties' claims.  This serves only to underscore the existence of a genuine issue of fact as to the objective reasonableness of Morgan's actions.

Next, Morgan contends he is entitled to qualified immunity.  "Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Carroll v. Pfeiffer, 262 F.3d 847, 849 (8th Cir. 2001)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991)(quoting, Malley v. Briggs, 475 U.S. 335, 343,

-13-

341 (1986)).  The inquiry is normally one of pure law.  J.H.H. v. O'Hara, 878 F.2d 240, 243 (8th Cir. 1989).

In order to overcome claims of qualified immunity, Plaintiff must also show that his constitutional rights were clearly established. A right is clearly established if its contours are sufficiently clear that a reasonable official would have fair warning of the type of action that would violate that right.  As discussed in more detail above, there is a question of fact as to whether Morgan used more force than was reasonably necessary.  I cannot at the summary judgment stage, resolve factual disputes in Morgan's favor or make credibility determinations.  See e.g., Wilson v. Lawrence County, 260 F.3d 946, 951 (8th Cir. 2001)("arguments asserting qualified immunity rest largely on ignoring disputed facts in the record and asking this court to resolve factual disputes in [defendant's] favor.").

With respect to any official capacity claims, Defendants maintain that there is no proof of the existence of county custom or policy that was the moving force behind the alleged constitutional violation.  "Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself." Gorman v. Bartch, 152 F.3d 907, 914 (8th Cir. 1998)(internal quotation marks and citations omitted).

I agree that there is no genuine issue of fact as to the existence of any unconstitutional county custom or policy.  Furthermore, there is no genuine issue of fact as to any individual or supervisory liability claim asserted against Denzer.  *Respondeat superior* cannot be used to find

-14-

him liable under § 1983.  See e.g., Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993).

Denzer was not personally involved in the incident and the evidence does not bear out any

allegation that Morgan was known to employ excessive force against detainees.  To the contrary,

Morgan was alleged to have used excessive force only five times, including this case, since 2006.

On no occasion was Morgan disciplined or determined to have used excessive force.  There is

no evidence that Denzer was involved in any cover-up.

### 4.  Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment

(Doc. 23) be granted in part and denied in part.   Specifically, I recommend the motion be

granted with respect to all claims against Denzer and any official capacity claim against Morgan.

I recommend that the motion be denied with respect to the individual liability claim against

Morgan and the case scheduled for a jury trial.

**The parties have fourteen (14) days from receipt of the report and recommendation
in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file
timely objections may result in waiver of the right to appeal questions of fact.  The parties
are reminded that objections must be both timely and specific to trigger de novo review by
the district court.**

DATED  this 21st day of May 2013.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE